**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| JEFFERSON COUNTY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DANNIE E. WILLIAMS, M.D., RICHARD S. | ) |
| SACKLER, M.D., CEPHALON, INC., TEVA | ) |
| PHARMACEUTICALS INDUSTRIES, LTD., | ) |
| TEVA PHARMACEUTICALS USA, INC., | ) |
| JANSSEN PHARMACEUTICALS, INC., | ) |
| JOHNSON & JOHNSON, ORTHO-MCNEIL- | ) |
| JANSSEN PHARMACEUTICALS, INC., | ) |
| JANSSEN PHARMACEUTICA, INC., | ) |
| NORAMCO, INC., DEPOMED, INC., ENDO | ) |
| HEALTH SOLUTIONS INC., ENDO | ) |
| PHARMACEUTICALS, INC., ALLERGAN PLC, | ) |
| WATSON LABORATORIES, INC., ACTAVIS | ) |
| PHARMA, INC., MALLINCKRODT, PLC, | ) |
| MALLINCKRODT LLC, SPECGX LLC, MYLAN | ) |
| PHARMACEUTICALS INC., CARDINAL | ) |
| HEALTH, INC., MCKESSON CORPORATION, | ) |
| AMERISOURCEBERGEN DRUG | ) |
| CORPORATION, AMERISOURCEBERGEN | ) |
| CORPORATION, HUNT FITZ DRUG, INC. | ) |
| D/B/A KELLER APOTHECARY, EXPRESS | ) |
| SCRIPTS PHARMACY INC., WAL-MART, INC., | ) |
| TARGET CORPORATION, WALGREEN | ) |
| COMPANY, MISSOURI CVS LLC, EXPRESS | ) |
| SCRIPTS HOLDING COMPANY, EXPRESS | ) |
| SCRIPTS, INC., CVS HEALTH CORPORATION, | ) |
| CAREMARKPCS HEALTH, LLC, CAREMARK, | ) |
| LLC, UNITEDHEALTH GROUP | ) |
| INCORPORATED, OPTUM, INC., OPTUMRX, | ) |
| INC. DELMAR PRIMARY CARE ASSOCIATES, | ) |
| LLC, and GURPREET S. PADDA, M.D., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. _____

**PBMS' NOTICE OF REMOVAL**

**JURY TRIAL DEMANDED**

In accordance with 28 U.S.C. §§ 1442(a) and 1446, Defendants Express Scripts, Inc., and OptumRx, Inc., remove the civil action captioned *Jefferson County v. Dannie E. Williams, M.D., et al.* (Case No. 20JE-CC00029), from the Missouri Circuit Court, Twenty-Third Judicial Circuit, to the United States District Court for the Eastern District of Missouri, Eastern Division.[1] Removal is proper under 28 U.S.C. § 1442(a), the federal-officer removal statute, and timely under 28 U.S.C. § 1446(b)(3).

## I.    INTRODUCTION

1.    In this lawsuit, Plaintiff Jefferson County seeks to recover damages for costs allegedly incurred in the past, or that allegedly will be incurred in the future, as a result of prescription opioids dispensed in its community.

2.    Express Scripts and OptumRx are pharmacy benefit managers (**PBMs**). They provide services to sponsors of health insurance plans that offer prescription-drug benefits. The PBMs help their clients—employers, government entities, unions, and others—manage prescription-drug benefits. Express Scripts' clients include the U.S. Department of Defense and health plans participating in the Federal Employees Health Benefits Program. OptumRx's clients include the Veterans Health Administration. The PBMs provide pharmacy-benefit-management services to those federal clients across the country, including to thousands of federal health-plan members in Jefferson County, Missouri.

3.    As detailed below, on November 15, 2023, the County unambiguously revealed for the first time through its service of liability expert reports—which claim harm from thousands of

---

[1] A notice of removal must contain only "a short and plain statement of the grounds for removal." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (quoting 28 U.S.C. § 1446(a)). "By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure." *Id.*

prescription claims the PBMs processed for federal health plans—that the County seeks to recover for work that the PBMs performed at the behest of the PBMs' federal clients. This case is therefore properly removed to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). Both the U.S. Court of Appeals for the Fourth Circuit and the federal district court overseeing the federal opioid multi-district litigation (**Opioid MDL**) have held that materially similar opioid cases challenging the PBMs' work for the federal government were properly removed to federal court under the federal-officer removal statute. *Cnty. Board of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 248 (4th Cir. 2021) (Express Scripts properly removed opioid case under federal-officer removal statute based on services provided to the Department of Defense); *In re Nat'l Prescription Opiate Litig.* (hereinafter, **Frederick County**), 2023 WL 166006, at *3–8 (N.D. Ohio Jan. 12, 2023) (same); *see also Grider Drug, LLC v. Express Scripts, Inc.*, 2009 U.S. Dist. Lexis 107515, at *4–11 (W.D. Ky. Nov. 17, 2009) (same for non-opioid case), *aff'd*, 500 F. App'x 402, 403 (6th Cir. 2012) ("The action was properly removed to federal court by Express Scripts.").

4.      For that reason and the reasons set forth below, the federal-officer removal statute entitles the PBMs to remove this case to federal court.

## II.      BACKGROUND

5.      Plaintiff Jefferson County has sued various entities to recoup the "public costs" that the County claims it has expended "fighting the opioid epidemic." Second Amended Petition (**SAP**) at 1. The defendants in this case originally included opioid manufacturers, distributors, retail pharmacies, and PBMs. The majority of defendants have settled with the County, leaving OptumRx and Express Scripts in the case.

6.      PBMs are different from manufacturers, distributors, and retail pharmacies. Unlike other participants in the pharmaceutical supply chain, PBMs do not manufacture, market, advertise, distribute, prescribe, or dispense opioids or any other medications. PBMs are private businesses that enter into service agreements with their clients to administer their clients' prescription-drug benefits and to process prescription claims for medications that have been approved by the U.S. Food and Drug Administration (**FDA**). *See* SAP ¶ 687. PBM clients include federal and state government agencies, Medicare Plan D sponsors, employers, unions, trusts, and other health-plan sponsors who contract with PBMs to provide pharmacy benefits to their employees or members.

7.      "Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 478 (2020). "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* "After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." *Id.*

8.      Express Scripts and OptumRx offer options to assist their clients with managing prescription-drug benefits, but it is up to plan sponsors to choose what benefits to provide to their plan beneficiaries and how to manage those benefits. In particular, plan sponsors select which medications their plans will cover (*i.e.*, what drugs are on a plan's formulary) and under what circumstances (*i.e.*, what utilization management and clinical programs, if any, are in place).

9.      Like most PBMs, Express Scripts and OptumRx develop formularies, utilization-management tools, and clinical programs that they offer to their clients. Some plan sponsors

3

choose to adopt Express Scripts' or OptumRx's offerings; others do not and instead create their own. Either way, the plan sponsor controls the formulary, utilization management, and clinical programs applicable to each plan that it sponsors. The PBM's role is to implement the plan sponsor's choices and administer the plan sponsor's prescription-benefit design for the plan beneficiaries.

10.     Under a contract with the U.S. Department of Defense (**DoD**), Express Scripts provides formulary services and other services to the DoD health care program known as TRICARE, which covers active-duty service members and veteran retirees across the country, including in Jefferson County, Missouri. Express Scripts also provides services to health plans participating in the Federal Employees Health Benefits Program (**FEHBP**), which is administered and overseen by the U.S. Office of Personnel Management (**OPM**), and which covers federal employees across the country, including in Jefferson County, Missouri.

11.     Under a contract with the federal Veterans Health Administration (**VHA**), OptumRx provides services to VHA health-plan members in the State of Missouri, including in Jefferson County. The U.S. Department of Veteran Affairs, through the VHA, operates the largest integrated health care system in the United States, providing health care services to millions of veterans each year at 1,233 health care facilities, 168 medical centers, and 1,053 outpatient clinics, and the services OptumRx provides to the VHA are subject to the federal government's guidance and control, under detailed contractual requirements that in some ways do not allow OptumRx to direct, change, or formulate policy in connection with the federal plan.

***Procedural History***

12.     On August 1, 2018, the County filed its first Petition, asserting claims on behalf of 11 cities and counties. *See Jefferson Cnty., et al. v. Purdue Pharma L.P.*, Pet. (22nd Jud. Cir., St.

Louis City, 1822-CC10883). Express Scripts and other defendants removed the case to federal court on August 31, 2018, under the Class Action Fairness Act (**CAFA**). No. 4:18-cv-01477-RLW (Nov. 1, 2018 E.D. Mo.) (Dkt. 1). The County voluntarily dismissed the case on November 1, 2018. *Id*. at Dkt. 82 (Notice of Voluntary Dismissal Without Prejudice). On January 29, 2019, the County filed a new Petition, this time on behalf of 20 cities and counties. *Jefferson Cnty., et al. v. Williams, et al.*, Pet. (22nd Jud. Cir., St. Louis City, 1922-CC00203). Then-Defendant CVS Pharmacy, Inc. removed the case under CAFA before the PBMs (or any other parties) were served. No. 4:19-cv-00157-RLW (Jan. 31, 2019 E.D. Mo.) (Dkt. 1). The case was then transferred to the federal Opioid MDL. *In re: National Prescription Opiate Litigation*, 1:17 MD 2804 (N.D. Ohio), No. 4:19-cv-00157-RLW (Jan. 31, 2019 E.D. Mo.) (Dkt. 21).

13.    On July 11, 2019, Judge Polster, the federal judge presiding over the Opioid MDL, issued a scheduling order acknowledging that two Missouri state court judges contacted him to request the remand of "a small number of cases brought by cities or counties within that same geographic region that were removed from their jurisdictions and landed in the MDL." *In re: National Prescription Opiate Litigation*, No. 1:17 MD 2804 (July 19, 2019 N.D. Ohio) (Dkt. 1828). One of those Missouri judges submitted a letter requesting that Judge Polster sever the claims of Jefferson County and Franklin County, Missouri from the Opioid MDL and remand those cases to the 22nd Judicial Circuit, State of Missouri, to be consolidated with another case. *Id.* The PBMs and other defendants asserted written objections, *id.* (Dkt. 1931), and on July 24, 2019, Judge Polster severed and remanded the Jefferson County and Franklin County cases to Missouri state court after concluding that the claim of removal jurisdiction under CAFA was "very tenuous," *id.* (Dkt. 1987).

14. On October 21, 2019, the County filed its First Amended Petition. *Jefferson Cnty., et al. v. Williams, et al.*, Am. Pet. (22nd Jud. Cir., St. Louis City, 1922-CC00203-01). This case was then transferred to the 23rd Judicial Circuit in Jefferson County on December 20, 2019.[2] *Id.* (Order dated Dec. 20, 2019). On June 15, 2020, the County filed its Second Amended Petition, which remains the operative complaint.

### The County's Treatment of Federal Plans

15. In its Second Amended Petition, the County alleges that the PBMs acted as a "gatekeeper[] of prescription drugs including opioids" and that the PBMs contributed to the opioid crisis by "controlling which pain medications reach the marketplace . . . through their self-serving formulary design." SAP ¶¶ 665, 713.

16. As the County acknowledges, written contracts govern the PBMs' relationships with their clients. SAP ¶¶ 692, 694, 696, 700–03. Those contracts confirm that PBMs do not control their clients' formularies. *See id.* ¶ 692 ("The drugs included on the PBM's formulary may be modified by PBM, *with prior approval by client* . . . .") (emphasis added). Yet in the Second Amended Petition, the County makes sweeping allegations about the PBMs' purported role in contributing to an oversupply of opioids, asserting that the PBMs controlled the flow of opioids by deciding to place opioids on the formulary products offered to their clients and by not offering adequate utilization management and clinical programs to their clients. *See id.* ¶ 684 ("[PBMs] influence which drug products are used most frequently and set prices for pharmacies.").

17. The County further alleges that the PBMs "refused" to limit access to opioids, are "driving patients to opioids" and "away from abuse-deterrent" medications, and that PBMs "place

---

[2] Jefferson County is the only county pursuing this case. The Franklin County case is before a different Missouri state court and is not part of this removal notice.

roadblocks in the way of limiting excessive opioid prescriptions" through their formulary and pricing strategies. *See id.* ¶¶ 705–08.  According to the County, the PBMs' "efforts to artificially increase the number of opioid prescriptions . . . directly and predictably caused a corresponding increase in opioid abuse" in Jefferson County. *Id.* at ¶ 712; *see id.* ¶¶ 778, 788, 830, 835 (alleging that the PBMs' conduct, in part, caused the County to incur expenses to address the alleged opioid epidemic, including costs for substance abuse treatment, law enforcement, rehabilitation services, childcare, and drug rehabilitation services, among others).

18.    Despite those sweeping allegations, the County did not in the Second Amended Petition identify any specific formularies, prescriptions, or health plans at issue in the case.

19.    Given the inherent ambiguity in the County's allegations and to preserve all of the PBMs' defenses, the PBMs moved to dismiss from the case claims based on the PBMs' relationships with certain federal plans, such as federal employee plans participating in FEHBP. In response, the County contended that its claims did not pertain to those federal plans, stating:

> PBM Defendants also contend that the County's claims are preempted by the Federal Employees Health Benefits Act, or FEHBA. Like ERISA, FEHBA preempts claims involving benefits for federal employees insured under a federal plan governed by FEHBA. ***Here, however, the County's claims do not involve any particular FEHBA plan, and indeed FEHBA is never referenced in the Amended Petition.***

*See* April 6, 2020 Pl. Opp. to Mot. to Dismiss at 19 (emphasis added).

20.    Given the continued ambiguity about the scope of the County's claims, the PBMs asked the County repeatedly in discovery requests and meet-and-confer discussions to identify, as required by Missouri law, the specific prescriptions that the County claims were improper and caused the County's alleged injuries. *See City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113, 115–16 (Mo. 2007) (en banc); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 243–44, 247 (Mo. 1984) (en banc).

21. Ultimately, the County agreed to identify what it describes as "red flag" criteria—the alleged indicators or warning signs that the County contends could suggest problematic prescriptions—and to apply those criteria to the prescription claims data that the PBMs have produced to the County (the "**Red Flag Analysis**").[3] The purpose of the Red Flag Analysis was to allow the PBMs to understand which prescription claims the County is relying on to support its case so that the PBMs can prepare defenses. The County provided its "Red Flag Analysis" in response to OptumRx, Inc.'s Interrogatory Nos. 11 and 12.

22. For months, the County served "interim" and ever-shifting Red Flag Analyses. Instead of serving a single, final Red Flag Analysis identifying the challenged prescription claims, the County has so far served *seven* different—and inconsistent—versions of the analysis, each of which purported to supersede earlier versions.

23. On February 3, 2022, the County served its sixth version of the Red Flag Analysis which identified—for the first time—9,326 prescription claims that Express Scripts adjudicated on behalf of the Department of Defense for TRICARE. The very next day, on February 4, 2022, the County sent a formal notice, a letter, and an email all stating that it was withdrawing the February 3 version in full due to an unspecified "error."

24. On February 14, 2022, the County served a revised Red Flag Analysis that omitted the TRICARE claims. Because the County apparently cured its "error" by serving the February 14, 2022 Red Flag Analysis, the PBMs understood that the February 14 version represented a complete list of prescription claims that the County contends caused the harm for which it seeks relief.

---

[3] The PBMs do not endorse or agree with the County's use of the language of "red flag" criteria but use that terminology in this removal notice to describe the County's allegations and contentions.

8

25.    Notwithstanding the County's omitting Department of Defense claims from its February 14, 2022 Red Flag Analysis, that submission appeared to suggest that the County was still seeking to hold the PBMs liable for prescription claims adjudicated or processed for other federal health plans. So the PBMs notified the County by letter on March 10, 2022 that they intended to remove this action to federal court unless the County "inform[ed] the PBM Defendants in writing on or before March 14, 2022, that it is withdrawing all challenges to federal prescription claims and will not seek recovery from the PBM Defendants based on the federal prescription claims—including but not limited to claims under the Federal Employee Health Benefit Act and claims adjudicated or processed for a plan controlled or sponsored by a federal governmental department or entity (for example, the Department of Defense)."

26.    The County responded in writing on March 11, 2022, stating that the "County agrees it is not challenging federal prescription PBM claims (including seeking recovery from the PBMs for same) in the instant state court proceeding."

*The Two Stipulations Regarding Federal Plans*

27.    To memorialize that position, the County entered into a Joint Stipulation and Consent Order with the PBMs on March 16, 2022. The stipulation provided that the County "will not now or at any time in the future in this state court litigation seek to establish liability against any of the PBM Defendants in connection with any Federal Plan." Exhibit D at ¶ 1.

28.    The stipulation defined "Federal Plan" as "any health care plan that is fully or partially funded by the federal government, any plan that is administered for any federal agency, or any plan that is delegated for administration by any federal agency. Federal Plans include, but are not limited to TRICARE, Federal Employment Health Benefits Act ('FEHBA') plans, Employer Group Waiver Plans ('EGWP'), and Medicare Part D plans." *Id.*

9

29.    The County further stipulated that it "will not now or at any time in the future in this state court litigation take the position or pursue any argument suggesting that the PBM Defendants' conduct relating to prescription claims for Federal Plans caused an oversupply of prescription opioids in Jefferson County, contributed to the theories of liability against the PBMs upon which Jefferson County bases its lawsuit, or caused or contributed to the harms for which Jefferson County seeks recovery." *Id.* at ¶ 2.

30.    The Honorable Joseph Rathert from the Missouri Circuit Court, Twenty-Third Judicial Circuit, signed the Joint Stipulation and Consent Order on March 17, 2022.

31.    In July 2022, the County entered into a second Joint Stipulation and Consent Order with OptumRx. In Paragraph 4 of that Joint Stipulation and Consent Order, the County represented that it "will not now or at any time in the future in this state court proceeding seek to establish liability against any of the Optum Entities in connection with any Federal Plan." The County agreed that for purposes of the stipulation, "[a] 'Federal Plan' means any health care plan that is fully or partially funded by the federal government, any plan that is administered for any federal agency, or any plan that is delegated for administration by any federal agency" and that such Federal Plans include "TRICARE, Federal Employment Health Benefits Act ('FEHBA') plans, Employer Group Waiver Plans ('EGWP') and Medicare Part D plans." *See* Exhibit E, Joint Stipulation and Consent Order at ¶ 4, filed Jul. 11, 2022.

32.    The County further agreed that it "will not now or at any time in the future in this state court proceeding take the position or pursue any argument suggesting that the Optum Entities' conduct relating to prescription claims for Federal Plans caused an oversupply of prescription opioids in Jefferson County, contributed to the theories of liability against OptumRx upon which

10

the County bases its lawsuit, or caused or contributed to the harms for which the County seeks recovery." *See* Exhibit E, Joint Stipulation and Consent Order at ¶ 5, filed Jul. 11, 2022.

33.     Judge Rathert signed the second Joint Stipulation and Consent Order on July 19, 2022.

34.     The PBMs litigated this case for the following year and a half in good-faith reliance on the two stipulations.

***Recent Developments Reveal that the County Is Challenging the PBMs' Work for Federal Plans***

35.     On November 15, 2023—after more than a year of the PBMs' good-faith reliance on the two Joint Stipulations and Consent Orders—the County first provided unambiguous notice that it was in fact seeking to hold the PBMs liable for the work that they performed at federal plans' behest.

36.     On that day, the County served on the PBMs three expert reports explaining the County's liability theories. Those expert reports do not differentiate between opioid prescription claims adjudicated for non-federal health plans and opioid prescription claims adjudicated for federal health plans.

37.     On the contrary, the County's liability expert reports confirm that, notwithstanding the stipulations, the County's claim for relief is based on the PBMs' overall business activities, including those on behalf of the federal government. The County's experts explicitly opine that the PBMs should be responsible for abating alleged harms caused by *every* prescription opioid claim adjudicated for plan members in and around Jefferson County, including tens of thousands of prescriptions adjudicated for federal plan members.

38.     Among other things, the County's experts created and rely on a new "red flag" analysis of opioid prescription claims that expressly covers claims for all of the PBMs' clients,

both federal and non-federal. Previously, when the County had provided a red flag analysis in response to the PBMs' interrogatories, it had sought to carve out prescription claims for TRICARE and other federal plans—as it did when it withdrew its submission in February 2022 that had included thousands of claims that Express Scripts processed for TRICARE.

39.    The County's November 2023 expert reports not only explicitly seek to establish PBM liability based on all claims, federal and non-federal without any attempt at a carveout, but they also rely on analyses in which the federal claims *cannot* be carved out. In particular, the County's experts perform a "red flag" analysis of data produced by other parties (retail pharmacies) on opioid prescriptions dispensed in Jefferson County that does not contain information about the health plans that covered those prescriptions. Without the information about the responsible health plan, it is impossible to carve out from that data the prescriptions dispensed to the PBMs' federal clients. The County nevertheless seeks to use that data to hold the PBMs liable in this case.

40.    The County's November 2023 expert reports thus unambiguously reveal for the first time that, notwithstanding its prior stipulations and representations, the County seeks to hold the PBMs liable for their work on behalf of the federal government.

### III.    GROUNDS FOR FEDERAL OFFICER REMOVAL

41.    The federal-officer removal statute permits any person to remove a case to federal court if the person is "acting under" a federal officer and is sued "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).

42.    The Supreme Court has instructed that the federal-officer removal statute is to be "liberally construed," *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (citation omitted), and it has "rejected a 'narrow, grudging interpretation' of the statute." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969)). Accordingly, "[u]nlike general removal, § 1442 is liberally construed and not constrained by the

well-pleaded complaint rule." *Minnesota v. API*, 63 F.4th 703, 714 (8th Cir. 2023); *see also Arlington Cnty.*, 996 F.3d at 250–51, 257 (upholding Express Scripts' removal of similar claims based on its work for TRICARE).

43.     "To remove the case, a private defendant must establish that (1) it acted under the direction of a federal officer, (2) there is a connection between the claims and the official authority, (3) the defendant has a colorable federal defense to the plaintiffs' claims, and (4) the defendant is a 'person,' within the meaning of the statute." *API*, 63 F.4th at 714.

44.     Both Express Scripts and OptumRx satisfy all four elements.

**A.     The PBMs Acted Under the Direction of a Federal Officer.**

45.     The "acting under" requirement contemplates a relationship in which the government exerts some "subjection, guidance, or control" over a private entity beyond mere compliance with the law. *Watson*, 551 U.S. at 151 (citation omitted). The central question is whether the private entity is helping a federal officer "fulfill other basic governmental tasks" that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153–54.

46.     Courts broadly construe § 1442, particularly regarding private parties who claim to be "acting under" a federal officer. *Id.* at 147; *see also Sahm v. Avco Corp.*, 2023 WL 3496150, at *2 (E.D. Mo. May 17, 2023) ("courts must broadly interpret the term 'acting under'").

47.     The PBMs have "acted under" the direction of federal officers in providing PBM services to federal health plans, including TRICARE, FEHBP plans, and the VHA.

**1.     Express Scripts Acts Under the Direction of a Federal Officer in Providing Services to TRICARE.**

48.     Here, as multiple courts have found in other jurisdictions, Express Scripts' provision of services to TRICARE members helps the DoD fulfill basic governmental tasks that it

would have to perform itself if it did not contract with Express Scripts. *See Arlington Cnty.*, 996 F.3d at 253 ("[T]he ESI Defendants are assisting DOD in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm.") (quoting *Watson*, 551 U.S. at 153–54)); *Frederick Cnty.*, 2023 WL 166006, at *5 ("[P]roviding prescription drug benefits to military members and veterans is a 'basic governmental task' assigned to the DoD by statute. *See* 10 U.S.C. § 1073a. The DoD would have to administer the TRICARE program itself if the task was not delegated to [the Express Scripts] Defendants; this fact also strongly favors removal."); *Grider*, 2009 U.S. Dist. Lexis 107515, at *8 ("[T]he Court finds that when executing its duties under this contract ESI is 'acting under' the Secretary of the DoD because it is performing a job that the DoD would otherwise have to perform.").

49. The DoD is required by law to enter into contracts for the provision of healthcare services to TRICARE members. *See* 10 U.S.C. § 1073a. The DoD is also statutorily required to establish an "effective, efficient, integrated pharmacy benefits program" for TRICARE. 10 U.S.C. § 1074g. To satisfy those statutory mandates, the DoD contracted with Express Scripts to provide pharmacy-benefit management services for members of TRICARE across the country, including in Jefferson County. As such, Express Scripts is "essentially acting as the statutorily authorized alter ego of the federal government." *Arlington Cnty.*, 996 F.3d at 253 (emphasis omitted).

50. A copy of the publicly available contract between DoD and Express Scripts, Contract No. HT9402-14-D-0002 (**TRICARE Contract**), with certain redactions consistent with the Freedom of Information Act, is attached as Exhibit F. Section C of the TRICARE Contract is the Express Scripts Military Health Statement of Work (**SOW**), which specifies in detail the services Express Scripts must provide.

14

51.     "The contract between the DoD and ESI is substantial . . . ." *Frederick Cnty.*, 2023 WL 166006, at *2. It "is memorialized in a lengthy 174-page Statement of Work ('SOW')." *Id.* at *3.

52.     In the TRICARE Contract, the DoD dictates nearly every aspect of Express Scripts' responsibilities in supporting TRICARE. "Of particular importance here, the SOW requires exclusive use of the DOD Uniform Formulary when acquiring drugs for federal government employees." *Id.*; *see* SOW §§ C.1.4, C.8.1. The DoD formulary is "managed by the DoD Pharmacy and Therapeutics P&T Committee." SOW § C.1.4. "The DoD formulary specifies which drugs are authorized for TRICARE members and sets requirements for prior authorization and utilization reviews, to assure 'medical necessity, clinical appropriateness and/or cost-effectiveness.'" *Frederick Cnty.*, 2023 WL 166006, at *3 (quoting SOW § C.1.4).

53.     "The SOW also contains a 'Prescription Restriction Program' that requires ESI to submit quarterly lists of patients for potential pharmacy benefit restrictions 'based upon the number of controlled medications filled, the number of physicians prescribing controlled medications and the number of pharmacies that fill these prescriptions." *Id.* (citation omitted). "Once these lists are submitted, another entity determines if a restriction is appropriate and only then can the Express Scripts Defendants restrict a beneficiary's prescription benefits." *Id.*

54.     The TRICARE Contract also requires the use of "a tiered cost sharing structure, and a preference for generic over branded products." SOW § C.1.4. When it serves as a pharmacy benefit manager administering benefits at retail pharmacies, Express Scripts serves in a capacity as a "fiscal intermediary on behalf of DoD to pay for all authorized pharmaceutical and supplies dispensed for eligible beneficiaries at retail pharmacies." SOW § C.1.6. Or as the TRICARE Contract puts it, "the Government will be acquiring covered drugs with Government funds for use

by the Government" when a TRICARE prescription is dispensed at retail network pharmacies. *Id.*

When it causes any copayment to be charged to any TRICARE beneficiary for any medication,

including prescription opioids, it does so in the manner and according to the directions carefully

prescribed by the DoD. *See* SOW § C.8.1.1 ("The Contractor shall comply with the provisions of

the DoD Uniform Formulary and its copayment structure").

      55.    These requirements are all mandated by Congress. *See* 10 U.S.C. § 1074g(a)(2)(A)

(requiring TRICARE to use a "uniform formulary" and that inclusion on the formulary "shall be

based on the relative clinical and cost effectiveness of the agents"); § 1074g(b) (requiring the

establishment of a "Pharmacy and Therapeutics Committee"). Congress not only requires cost-

sharing that favors generics, but it spelled out the precise cost-sharing amounts for the years 2018

through 2027 in a table written into the statute:

| For: | The cost-sharing amount for a 30-day supply of a retail generic is: | The cost-sharing amount for a 30-day supply of a retail formulary is: | The cost-sharing amount for a 90-day supply of a mail order generic is: | The cost-sharing amount for a 90-day supply of a mail order formulary is: | The cost-sharing amount for a 90-day supply of a mail order non-formulary is: |
|---|---|---|---|---|---|
| 2018 | $11 | $28 | $7 | $24 | $53 |
| 2019 | $11 | $28 | $7 | $24 | $53 |
| 2020 | $13 | $33 | $10 | $29 | $60 |
| 2021 | $13 | $33 | $10 | $29 | $60 |
| 2022 | $14 | $38 | $12 | $34 | $68 |
| 2023 | $14 | $38 | $12 | $34 | $68 |
| 2024 | $16 | $43 | $13 | $38 | $76 |
| 2025 | $16 | $43 | $13 | $38 | $76 |
| 2026 | $16 | $48 | $14 | $44 | $85 |
| 2027 | $16 | $48 | $14 | $44 | $85 |

10 U.S.C. § 1074g(a)(6)(A).

      56.    Simply put, the services that Express Scripts provides to TRICARE fall under the

DoD's guidance and control. As Judge Polster explained:

> By requiring exclusive use of its own Uniform Formulary—which
> is created and updated by the DoD Pharmacy and Therapeutics

Committee—the DoD exercises guidance and control over the Express Scripts Defendants' performance. The formulary determines which pharmaceuticals are covered by TRICARE prescription benefit plans, and it contains cost-sharing tiers that determine the reimbursement amounts for various medications, including prescription opioids. Furthermore, the Uniform Formulary dictates which drugs are subject to prior authorization or utilization review requirements. All prescription claims handled by the Express Scripts Defendants must be 'processed according to the benefit design' and the restrictions contained in the Uniform Formulary.

In addition, effectuating the Prescription Restriction Program requires ongoing, close coordination between the Express Scripts Defendants and the DoD. To prevent prescription drug abuse, the Express Scripts Defendants are required to use claims data to create a list of patients for potential prescription restriction, based on the number of controlled medications filled by the patient, the number of physicians prescribing these medications, and the number of pharmacies filling the prescriptions. However, the Express Scripts Defendants do not themselves have any authority to restrict a TRICARE member's prescriptions based on the lists they compile. Instead, the Defendants must send this data to a Military Treatment Facility or a Managed Care Support Contractor, who alone can determine whether restricting a patient's prescription benefits is appropriate. If these entities decide to impose a restriction, ESI must then take one of only two available restrictive actions delineated in the DoD contract.

These contract terms leave the Express Scripts Defendants little, if any, room for discretion as they administer the TRICARE program. Indeed, the contract states that Defendants are to be paid fees for 'performing services under the contract.' A review of the contract reveals that this characterization is correct—the Defendants perform largely administrative tasks as they carry out the directives of the government. . . .

In sum, the Express Scripts Defendants' relationship with the DoD is accurately described as one involving "subjection, guidance, or control" by the federal government, as outlined by the Supreme Court in *Watson*.

*Frederick Cnty.*, 2023 WL 166006, at *4–5 (citations omitted).

17

57.     Thus, Express Scripts is "acting under" a federal officer when providing services for the TRICARE program. *See Arlington Cnty.*, 996 F.3d at 251–54; *Frederick County*, 2023 WL 166006, at \*4–5; *Grider*, 2009 U.S. Dist. Lexis 107515, at \*5–9.

### 2.     Express Scripts "Acts Under" the Direction of a Federal Officer When Providing Services to FEHBP.

58.     Similarly, Express Scripts acts under the direction of a federal officer when it provides services for federal employees under FEHBP. In the Federal Employees Health Benefits Act of 1959 (**FEHBA**), Congress empowered OPM "to contract with private carriers for federal employees' health insurance." *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 90 (2017).

59.     As one such provider, Express Scripts is subject to OPM's requirements, oversight, and control in administering and supporting FEHBP plans, including specific regulations OPM established to govern PBM providers, *see* 48 C.F.R. §§ 1602.170-16(a), 1604.7201(a), 1652.204-74(a), 1652.204-70, 1652.246-70, and specific guidelines that OPM issued to govern pharmacy benefits, including guidelines on formulary management, utilization management, and prescription opioids, among other topics.[4]

60.     OPM closely monitors Express Scripts' performance of its contractual tasks by auditing Express Scripts' work. Those audits include reviews of quarterly rebate guarantees, annual reconciliation and payments, actual billing and allocation of rebates, administrative fees, claim payments, fraud and abuse standards, performance guarantees, pharmacy rebates, and even site visits.

---

[4]  *See, e.g.*, FEHB Program Carrier Letter 2019-10, https://www.opm.gov/healthcare-insurance/healthcare/carriers/2019/2019-10.pdf.

61.    Thus, Express Scripts is "acting under" a federal officer when providing services to FEHBP plans. *See Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1233–35 (8th Cir. 2012) (holding that an insurance vendor to an FEHBP plan properly removed a case under the federal officer removal statute because it was helping "the government fulfill the basic task of establishing a health benefits program for federal employees"), *abrogated on other grounds by BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1536 (2021); *see also St. Charles Surgical Hosp., L.L.C. v. Louisiana Health Serv. & Indemnity Co.*, 935 F.3d 352, 355–56 (5th Cir. 2019) (considering "OPM's role in providing health care to federal employees" under FEHBA and concluding removing Blue Cross entities satisfied "acting under" requirement of federal officer removal statute).

### 3.    OptumRx "Acts Under" the Direction of a Federal Officer in Performing its contracts with the Veterans Health Administration.

62.    The U.S. Department of Veteran Affairs is a federal executive department. 38 U.S.C. § 301; *see also Vasquez v. Ayudando Guardians, Inc.*, 2018 U.S. Dist. Lexis 25068, at *5 (D.N.M. Feb. 15, 2018) (holding that a *Bivens* claim against the VA was barred by sovereign immunity as a claim against "the United States and its agencies."). The U.S. Department of Veteran Affairs, through the Veterans Health Administration (**VHA**), operates the largest integrated health care system in the United States, providing health care services to millions of veterans each year at 1,233 health care facilities, 168 medical centers, and 1,053 outpatient clinics.

63.    From 2009 through the present, the VHA has hired OptumRx to provide pharmacy-benefit management services. OptumRx serves as a third-party administrator, providing PBM services, to assist the VHA in providing health care services to millions of veterans, their dependents, and their beneficiaries each year—including members in Jefferson County, Missouri.

*See* 38 U.S.C. § 301. OptumRx provides PBM services to the VHA under the detailed requirements of its contract and lengthy Performance Work Statement (the VHA contract).

64.    The relationship between OptumRx and the VHA is an unusually close one involving detailed regulation, monitoring, and supervision. *Jacks*, 701 F.3d at 1231. The VHA dictates nearly every aspect of its relationship with OptumRx.

65.    ***Complete Control Over Formulary Construction.*** The VHA has its own Pharmacy & Therapeutics Committee (P&T Committee)[5] and constructs its own formulary. OptumRx does not decide what prescription drugs are covered or not covered on the VHA's formulary, nor does OptumRx make recommendations regarding formulary design.

66.    ***Complete Control Over Claims Processing***. The VHA maintains complete control of claim adjudication and pricing logic.

67.    ***Daily Communication.*** The VHA Contract requires weekly communication between the VHA and OptumRx.

68.    ***Appointment of Contracting Officer Technical Representative.*** The VHA appoints a Contracting Officer and a Contracting Officer's Representative who are responsible in part for monitoring contract performance.

69.    ***Inspections.*** The VHA subjects OptumRx to periodic inspections to evaluate outcomes on a periodic basis.

70.    ***Payment from the U.S. Treasury.*** The U.S. Treasury pays OptumRx directly for the PBM services that OptumRx supplies to the VHA. *Cf. Jacks*, 701 F.3d at 1234 (holding that

---

[5] A P&T Committee typically comprises independent physicians and pharmacists who evaluate existing and emerging drugs based on clinical evidence.

federal officer removal was proper where FEHBA program carrier "uniquely operates with the United States Treasury").

71.     OptumRx carries out functions that the VHA would otherwise have to provide itself under a contract that provides for unusually close oversight, involving detailed regulation, monitoring, and supervision from the VHA. OptumRx thus is "acting under" a federal officer when providing PBM services for the VHA.

**B.      There is a Connection Between the PBMs' Challenged Conduct and the Federal Officer's Direction.**

72.     Under the federal officer removal statute, a removing defendant must show that the challenged conduct was "for *or relating to* any act under color" of the federal office. 28 U.S.C. § 1442(a)(1) (emphasis added).

73.     Before 2011, the statute allowed removal only for "any act under color" of the office. 28 U.S.C. § 1442(a)(1) (2010).

74.     In 2011, Congress "passed the Removal Clarification Act of 2011, which added the words 'or relating to' into § 1442(a)(1)." *API*, 63 F.4th at 714 (quoting Removal Clarification Act of 2011, Pub. L. No. 112-51 § 2(b)(1)(A), 125 Stat. 545, 545 (Nov. 9, 2011)).

75.     By changing the statutory language, Congress "changed the requirement to a lower 'relates to' standard." *Id.* (collecting cases). That change was "intended to broaden the universe of acts that enable Federal officers to remove to Federal Court." *Id.* (quoting *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 624 (6th Cir. 2016)). "Under this standard, the requirement is met if the charged conduct has a 'connection' or 'association' with the federal action." *Id.* (quoting *Mayor of Balt. v. BP P.L.C.*, 31 F.4th 178, 233(4th Cir. 2022)); *accord Arlington County*, 996 F.3d at 256 ("[T]his 'connection or association' standard is broader than the old 'causal nexus' test that we abandoned after the Removal Clarification Act of 2011 . . .

21

expanded § 1442(a)(1) . . . ."). This new test echoes how the Supreme Court has interpreted the phrase "relating to," which is a "broad" phrase meaning "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into *association with or connection with*." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (emphasis added) (citation omitted).

76.      Both Express Scripts and OptumRx satisfy the "connection" requirement.

### 1.      There is a Connection Between the County's Liability Theories and Express Scripts' Alleged Conduct.

77.      Just as in *Frederick County*, Jefferson County claims here that Express Scripts is liable as a PBM because it "used a formulary that caused more opioids to be dispensed in its community than were medically and clinically necessary." 2023 WL 166006, at *5. For example, one of the County's liability expert opines that Purdue Pharma's widely recognized wrongful conduct would not have occurred but for the "preferred formulary position [for Purdue Pharma opioids] on Express Scripts . . . formularies." The County further claims that Express Scripts should have implemented greater restrictions—through utilization management (such as prior authorizations or quantity limits)—on the insurance coverage its client health plans provide for prescription opioids dispensed in Jefferson County.

78.      The County's liability expert reports make unambiguously clear—for the first time—that the County is seeking to support its liability claims against Express Scripts based on the work Express Scripts performed at the behest of the federal government. The County's liability experts conducted a "red flag" analysis of data produced by Express Scripts and by retail pharmacies regarding the number of prescription opioids dispensed in Jefferson County and its neighboring counties for which Express Scripts processed insurance claims. Based on that analysis, the County's experts opine that Express Scripts processed tens of thousands of insurance claims for prescription opioids dispensed in the Jefferson County area between 2006 and 2019 that

met the County's "red flag" criteria. Many of those claims Express Scripts processed at the direction of TRICARE, FEHBP plans, or other federal plans. The County's experts opine that the "opioid epidemic could have been greatly abated" had Express Scripts implemented different formularies, utilization management, and/or clinical programs that denied those "red flag" insurance claims—including claims for TRICARE and FEHBP plans.

79.     Because the County's experts rely in part on data from retail pharmacies that do not identify the health plan that covered each prescription, it would be impossible to carve out which particular "red flag" prescriptions were for members of TRICARE or FEHBP plans even if the County's liability experts had tried to do so (which they did not). Instead, the County's experts opine that Express Scripts should be liable for "every opioid sold," irrespective of whether the prescription opioid was dispensed to a member of TRICARE, a FEHBP plan, or another plan.

80.     In addition, some of the County's "red flags" are contingent on other "red flags." For example, the County's experts flag all prescriptions attributable to the top 20 opioid prescribers and the top 50 patients based on opioid utilization, but whether a particular prescriber or physician falls within those categories depends on which prescriptions are counted. Or take the County's experts' application of a "recurrent flag" computation—which flags all later claims by the same prescriber or for the same patient if an initial claim was flagged by one of the County's 20 "red flag" criteria. Applying that "red flag" results in the identification of thousands of "red flag" claims for prescription opioids processed through non-federal health plans based entirely on an initial "red flag" of a claim processed through a federal health plan, like TRICARE or a FEHBP plan. There is no way to disentangle federal claims from non-federal claims based on the County's liability expert's reports.

81.     Further, the County's liability experts reports contend that the PBMs must provide "abatement" for the entire opioid epidemic in Jefferson County, and the County's proposed abatement plan seeks abatement in connection with the aggregate impact of *all* opioid prescriptions dispensed in the County, including those to TRICARE and FEHBP plan members.

82.     As explained above, DoD specifies the formulary for TRICARE members as well as the requirements and restrictions that Express Scripts must adhere to when adjudicating claims by TRICARE members for prescription opioids and other FDA-approved medications. And OPM likewise imposes rules and guidelines governing formularies for FEHBP plans. In other words, the County seeks to hold Express Scripts liable for adhering to its contracts with federal health plans— that is, for allegedly failing to implement restrictions on insurance claims for prescription opioids that differed from what DoD and OPM directed Express Scripts to implement for TRICARE and FEHBP plan members.

83.     The conduct alleged against Express Scripts is therefore caused by, connected to, and associated with the very tasks that it must carry out for TRICARE and FEHBP plans.

84.     The County's liability experts separately opine that Express Scripts collaborated with Purdue Pharma "in several crucial ways to expand the pain treatment market and flood the market with opioids." In particular, the County's experts point to Purdue Pharma's misconduct detailed in Purdue's October 2020 guilty plea and settlement agreement with the United States. That 2020 settlement agreement explains that Purdue caused false and fraudulent insurance claims for prescription opioids to be submitted for payment to "the TRICARE Program" and "FEHBP." Exhibit G at p. 3-4 ¶ I, p. 12-13 ¶ c. In other words, through its allegations of collaboration with Purdue, the County's liability experts seek to pin liability on Express Scripts in connection with its work processing insurance claims for prescription opioids for TRICARE and FEHBP plans.

24

85.     Express Scripts' challenged conduct was thus for or relating to acts under the color of federal office for purposes of the federal-officer removal statute. *See Arlington Cnty.*, 996 F.3d at 256–57 ("Arlington faults the ESI Defendants for filling certain opioid prescriptions and causing a public nuisance, but the ESI Defendants were required to fill those prescriptions to comply with their duties under the DOD contract because they had no ability to modify the contract. . . . [That] mean[s] that Arlington's claims 'relate to' the ESI Defendants' governmentally-directed conduct."); *Frederick Cnty.*, 2023 WL 166006, at *5–6 ("[T]he Court finds that the Express Scripts Defendants have demonstrated a causal nexus between actions performed pursuant to the DoD contract and Plaintiffs' [opioid] lawsuits.").

> **2.      There is a Connection Between the County's Liability Theory and OptumRx's Alleged Conduct.**

86.     The connection element is satisfied here as to OptumRx as well.

87.     As with Express Scripts, the County's liability expert reports make clear for the first time that the County is seeking to support its liability claims against OptumRx based on the work OptumRx performed at the behest of the federal government. The County's liability experts conducted a "red flag" analysis of data produced by OptumRx and by retail pharmacies regarding the number of prescription opioids dispensed in Jefferson County and its neighboring counties for which OptumRx processed insurance claims. Based on that analysis, the County's experts opine that OptumRx processed tens of thousands of insurance claims for prescription opioids dispensed in the Jefferson County area between 2010 and 2019 that met the County's "red flag" criteria, including prescription claims that OptumRx processed at the direction of the Veterans Health Administration or other federal plans.

88.     Because the County's experts rely in part on data from retail pharmacies that do not identify the health plan that covered each prescription, it would be impossible to carve out which

particular "red flag" prescriptions were for members of the VHA plan even if the County's liability experts had tried to do so (which they did not). In addition, some of the County's "red flags" are contingent on other "red flags." For example, the County's experts flag all prescriptions attributable to the top 20 opioid prescribers and the top 50 patients based on opioid utilization, but whether a particular prescriber or physician falls within those categories depends on which prescriptions are counted. Or take the County's experts' application of a "recurrent flag" computation—which flags all subsequent claims by the same prescriber or for the same patient if an initial claim was flagged by one of the County's 20 "red flag" criteria. Applying that "red flag" results in the identification of thousands of "red flag" claims for prescription opioids processed through non-federal health plans based entirely on an initial "red flag" of a claim processed through a federal health plan, like the VHA. There is no way to disentangle federal claims from non-federal claims based on the County's liability expert's reports.

89.     Further, the County's liability expert reports contend that the PBMs must provide "abatement" for the entire opioid epidemic in Jefferson County, and the County's proposed abatement plan seeks abatement in connection with the aggregate impact of *all* opioid prescriptions dispensed in the County, including those to VHA and other federal health plan members.

90.     As explained above, the VHA constructs its own formulary and prior-authorization criteria. OptumRx is not entitled to direct, change, or engage in the formulation of VHA policy. OptumRx adjudicates prescription opioid claims for the VHA based on the VHA's formulary and pricing logic.

91.     In administering the formulary design for the VHA plan, and by adjudicating prescription opioid claims for that health plans, OptumRx at all times acted at the direction of the federal government and in accordance with contractual obligations.

92.     OptumRx's administration of the formulary design for the VHA health plan and adjudication of prescription opioid claims for VHA plan members—conduct that the County expressly challenges in this action—are caused by, connected to, and associated with the activities it carries out at the direction of the VHA.

### C.      The PBMs have colorable federal defenses to the County's claims.

93.     "The Eighth Circuit has long held that '§ 1442(a)(1) does not require a court to hold that a defense will be successful before removal will be appropriate.'" *Sahm*, 2023 WL 3496150, at *4 (quoting *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)). That is because "[o]ne of the primary purposes of the removal statute—as its history clearly demonstrates—*was to have such defenses litigated in the federal courts*." *Willingham*, 395 U.S. at 407 (emphasis added); *see also id*. ("The officer need not win his case before he can have it removed."). Instead, the removing party need show only that it has a "colorable federal defense to the plaintiff's claims." *Sahm*, 2023 WL 3496150, at *2. "In construing the colorable federal defense requirement, [the Supreme Court has] rejected a 'narrow, grudging interpretation' of the statute.'" *Jefferson Cnty.*, 527 U.S. at 431 (citation omitted).

94.     Here, the PBMs have at least two colorable federal defenses: a government-contractor defense and a preemption defense. The PBMs reserve the right to assert additional federal defenses, including those not stated in this Notice of Removal.

### 1.      Government Contractor Defense

95.     The federal government contractor defense applies when (1) the United States approved reasonably precise specifications; (2) the contractor's work product conformed to those specifications; and (3) the supplier warned the United States about the risks or exposures in the use of the equipment known to the supplier but not to the United States. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *Sahm*, 2023 WL 3496150, at *5. The defense protects

government contractors from state tort liability that may befall them should they carry out a federal contract. In other words, the defense "applies if a contractor's obligations to the government conflict with state law such that the contractor may not comply with both." *Arlington Cnty.*, 996 F.3d at 255 (citation omitted).

96.     Here, the government contractor defense is available to the PBMs.

97.     Express Scripts assisted the federal government by providing healthcare services pursuant to highly precise directives contained in the lengthy TRICARE Contract with the DoD and pursuant to contracts with FEHBP plans under OPM's specific requirements and supervision. Express Scripts' performance conformed to the specifications in the TRICARE Contract and FEHBP contracts. And Express Scripts did not have any greater awareness than the federal government did of the dangers of prescription opioids.

98.     Among other things, Express Scripts' contract with the DoD required exclusive use of the DoD formulary and implementation of the government's Prescription Restriction Program, both of which conflict with the core state law duties that the County asserts in this case. There is a similar conflict between the asserted state law duties and Express Scripts' obligations under its contracts with FEHBP plans. Those conflicts make it impossible for Express Scripts to comply with the state law duties that the County alleges while also fulfilling its obligations under its federal contracts.

99.     Multiple courts have concluded that those factual assertions are sufficient for Express Scripts to state a colorable government contractor defense that supports removal of opioid cases under the federal-officer removal statute. *See Arlington Cnty.*, 996 F.3d at 255 (Express Scripts defendants "have met the jurisdictional requirement of possessing a 'colorable federal

defense'"); *Frederick Cnty.*, 2023 WL 166006, at *8; *see also In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1078 (N.D. Ohio 2018) (same for non-PBM defendant).

100.    Likewise, OptumRx can assert the federal contractor defense because the County's theory of liability is predicated on OptumRx's alleged failure to implement a specific formulary, specific opioid utilization limits, or specific restrictions on opioids different from those mandated by OptumRx's VHA contract.

101.    Based on the County's allegations, OptumRx cannot simultaneously comply with its obligations under its VHA contract and comply with the County's interpretation of Missouri law, making a federal contractor defense colorable. *See Arlington Cnty.*, 996 F.3d at 255.

### 2.    Preemption

102.    Express Scripts also has a colorable preemption defense under at least two federal statutes: the TRICARE statute and FEHBA.

103.    The TRICARE statute provides the statutory authorization for the Secretary of Defense to enter into group health insurance contracts. *See* 10 U.S.C. §§ 1071, 1072(7), 1073(a), 1074g. The statute expressly preempts any state laws to the extent that the Secretary of Defense determines that those laws are "inconsistent with a specific provision of the contract" or that preemption "is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest." 10 U.S.C. § 1103(a). The Secretary has determined that such preemption is necessary. *See* 32 C.F.R. §§ 199.17(a)(7), 199.21(o).

104.    The County's theory of liability is that Express Scripts allegedly failed to implement specific formulary positioning for prescription opioids, specific utilization management rules for prescription opioids, and/or other restrictions on prescription opioids that differ from those that DoD mandated for the TRICARE program. In other words, the conduct complained of

is conduct that Express Scripts was required to carry out to comply with the TRICARE Contract as well as the TRICARE statute, regulations, and policies.

105.    Multiple courts have concluded that those factual assertions are sufficient for Express Scripts to state a colorable preemption defense to support removal under the federal-officer removal statute in opioid cases like this. *See Arlington Cnty.*, 996 F.3d at 256 ("[U]nder the well-established preemption doctrines applicable to such claims, it is plausible that the ESI Defendants have a valid preemption defense."); *Frederick Cnty.*, 2023 WL 166006, at *8 ("[T]he Express Scripts Defendants have a colorable argument that the DoD contract preempts the Plaintiffs' state law claims."); *see also Grider*, 2009 U.S. Dist. Lexis 107515, at *10 (holding in a non-opioid case that Express Scripts advanced a colorable preemption defense based on its TRICARE Contract).

106.    FEHBA also supports a preemption defense. It contains an express preemption provision displacing any state laws relating to coverage or benefits afforded by FEHBA plans. 5 U.S.C. § 8902(m)(1).

107.    Here, FEHBA preempts the claims against Express Scripts because they seek to interfere with uniform FEHBP plan administration by trying to dictate the terms of FEHBP plans with respect to coverage of, and benefits afforded for, prescription opioids.

**D.    The PBMs are "Persons" under the Federal Officer Removal Statute.**

108.    The PBMs are "persons" under the federal-officer removal statute because they are corporations. "Corporate entities are considered 'persons' for purposes of § 1442(a)(1)." *Kelly v. Monsanto Co., et al.*, 2016 WL 3543050, at *7 n.11 (E.D. Mo. June 29, 2016); *see also Jacks*, 701 F.3d at 1230 n.3 ("[T]he 'person' contemplated by the federal officer removal statute includes corporations."); *Watson*, 551 U.S. at 152–53 (interchangeably discussing a "private person" and "company" when analyzing the relevant relationship under the federal-officer removal statute).

109.    Courts have concluded that Express Scripts is a "person" under the federal-officer removal statute. *See Grider*, 2009 U.S. Dist. Lexis 107515, at *5 ("[F]or the purposes of federal officer removal statute, the Court finds that ESI is a 'person.'").

## IV.    VENUE

110.    Venue is proper in this Court under 28 U.S.C. § 1442(a) because this Court sits in the federal judicial district and division embracing the Jefferson County Circuit Court, the court from which removal is sought. *See* 28 U.S.C. § 1442(a) ("A civil action … that is commenced in a State court … may be removed … to the district court of the United States for the district and division embracing the place wherein it is pending.").

## V.    REMOVAL PROCEDURES

111.    The federal-officer removal statute does not require all defendants to consent to removal. *See, e.g., Fowler v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965) ("[I]t is settled that the filing of a petition for removal by a single federal officer removes the entire case to the federal court."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) ("Whereas all defendants must consent to removal under section 1441, a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citations omitted).

112.    In compliance with 28 U.S.C. § 1446(a) and the rules of this Court, true and correct copies of all process, pleadings, and orders previously served on the PBMs in the state court are attached as Exhibit A (operative state court complaint) and Exhibit B (complete state court record), along with the state court docket sheet, which is attached as Exhibit C.

113.    Promptly after filing this Notice of Removal, the PBMs will give written notice to the County, which is the only adverse party, and will file a copy of this Notice with the Clerk of the Jefferson County Circuit Court as 28 U.S.C. § 1446(d) requires.

## VI.    REMOVAL IS TIMELY

114.    "[A] notice of removal may be filed within 30 days after receipt by the defendant … of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).

115.    In the Eighth Circuit, the thirty-day removal period in § 1446(b)(3) "begins running upon receipt of the initial complaint only when the complaint *explicitly* discloses" the basis for removal. *In re Willis*, 228 F.3d 896, 897 (8th Cir. 2000) (per curiam) (emphasis added). The *Willis* rule "promotes certainty and judicial efficiency," *id.*, and prevents litigants from needing to "glean" the other side's intentions. *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 974 (8th Cir. 2011).

116.    If the complaint does not "explicitly disclose" the basis for removal, the time limit begins when the removing defendant receives from the plaintiff an "amended pleading, motion, order or other paper" that "set[s] forth a sufficiently detailed and *unequivocal* statement from which the defendant may *unambiguously* ascertain that the … jurisdictional requirements have been satisfied." *Gibson v. Clean Harbors Envtl. Servs., Inc.*, 840 F.3d 515, 520 (8th Cir. 2016) (quotation omitted and emphasis added). "Although a defendant has a duty to 'apply a reasonable amount of intelligence to its reading' of any such document received from the plaintiff, a defendant has no duty 'to search its own business records or perform an independent investigation into a plaintiff's indeterminable allegations to determine removability.'" *Id.* at 519–20 (quoting *Graiser v. Visionworks of Am., Inc.*, 819 F.3d 277, 285 (6th Cir. 2016)). "If removability is not apparent from the allegations of such document sent from the plaintiff, [the] thirty-day time period does not begin to run." *Id.* (cleaned up) (internal quotations and citation omitted).

117.    In this case, the County represented in its opposition to a motion to dismiss, in various representations, and in two separate stipulations that it was *not* seeking to recover based

32

on prescription claims associated with federal contracts.

118.    Only after receiving the County's liability expert reports on November 15, 2023, could the PBMs unambiguously ascertain for the first time the County's intent (in the face of two stipulations to the contrary) to pursue liability based on the PBMs' work at the behest of the federal government. *See Gibson*, 840 F.3d at 522 (holding that time for removal was not triggered until service of expert report that for the first time enabled the defendant to determine unambiguously that case was removable); *Parish of Plaquemines v. Chevron USA, Inc.*, 7 F.4th 362, 366–67, 372 (5th Cir. 2021) (same); *see also Andrews v. 3M Co.*, 2014 WL 12615710, at *2 (D.S.C. Feb. 6, 2014) (30-day removal clock triggered only when removing Defendants became "aware of whether Plaintiffs' claims were based on products that may give rise to a government contractor defense").

119.    For the reasons detailed above in Section III.B, the County's liability expert reports cannot be reconciled with the County's prior stipulations and purported disclaimers. They unambiguously reveal for the first time that, notwithstanding the County's earlier representations to the contrary, the County's claim for relief is based on the PBMs' work on behalf of federal plans, which makes this case removable under the federal officer removal statute.

120.    This notice of removal is therefore timely filed under 28 U.S.C. § 1446(b)(3).

## VII.    NO WAIVER

121.    By filing this Notice of Removal, the PBMs do not waive, either expressly or impliedly, their right to assert any defense they could have asserted in Jefferson County Circuit Court. The PBMs reserve the right to amend or supplement this Notice of Removal.

## VIII.    CONCLUSION

Accordingly, the PBMs give notice of the removal of this case from the Missouri Circuit Court, Twenty-Third Judicial Circuit, to the United States District Court for the Eastern District

of Missouri, Eastern Division.

DATED this December 1, 2023.

Respectfully submitted,

/s/ Bradley J. Schlozman
Bradley J. Schlozman #48811
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
bschlozman@hinklaw.com

Daniel S. Simon #47566
**DANIEL SIMON LAW OFFICE**
2635 S. Providence Rd. Suite 105
Columbia, MO 65203
Tel.: (573) 256-8989
Fax: (573) 256-5044
dan@dansimonlaw.com

Brian D. Boone (*Pro hac vice*)
Emily C. McGowan (*Pro hac vice*)
Brandon C.E. Springer (*Pro hac vice*)
**ALSTON & BIRD LLP**
1120 S. Tryon St., #300
Charlotte, NC 28203
Tel.: (704) 444-1000
Fax: (704) 444-1111
brian.boone@alston.com
emily.mcgowan@alston.com
brandon.springer@alston.com

William H. Jordan (*Pro hac vice*)
Caroline R. Strumph (*Pro hac vice*)
Bradley Harder (*Pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
Fax: (404) 881-7777
bill.jordan@alston.com

/s/ Jonathan G. Cooper
Jonathan G. Cooper (*pro hac vice*)
Olga M. Vieira (*pro hac vice*)
Erica L. Perdomo (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1300 I St. NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8000
jonathancooper@quinnemanuel.com
olgavieira@quinnemanuel.com
ericaperdomo@quinnemanuel.com

/s/ Christopher J. Lang
Christopher J. Lang #49256
**NICHOLS LANG & HAMLIN, LLC**
1795 Clarkson Road, Ste 230
Chesterfield, MO 63017
Tel.: (314) 429-1515
Fax: (314) 428-9592
chris@nlh-law.com

*Attorneys for Defendant Express Scripts, Inc.*

34

caroline.strumph@alston.com
bradley.harder@alston.com

Kimberly K. Chemerinsky (*Pro hac vice*)
Ethan J. Bond (*Pro hac vice*)
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA 90071
Tel.: (213) 576-1000
Fax: (213) 576-1100
kim.chemerinsky@alston.com
ethan.bond@alston.com

*Attorneys for OptumRx, Inc.*